IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOSH WHITAKER, MONIQUE JANNETTE and LESLIE GREER, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 3:03-CV-0411-P |
| WEST VILLAGE LIMITED PARTNERSHIP and PPC/IMA INTOWN VILLAGE LIMITED PARTNERSHIP, ET AL., | § § § § § § | **CLASS ACTION** |
| Defendants/Cross-Claimants/Third-Party Plaintiffs. | § | |

_____

| | | |
|---|---|---|
| PATRICIA SAPP, | § § | |
| Plaintiff, | § § | CIVIL ACTION NO. |
| v. | § § | 3:06-CV-1018-P |
| CWS APARTMENT HOMES, L.L.C., ET AL., | § § § | |
| Defendants. | § | |

## ORDER

On April 12, 2010, this Court entered an order directing the Parties to file briefs discussing their two remaining unresolved issues. The first issue concerns kitchen compliance and the second concerns whether the non-party condominium owners' units must be remediated.[1]

---

[1] By agreement, West Village (the original owner) must reimburse CWS (the purchaser) for the costs CWS incurs in remediating the residential units.

I.    **Kitchen Compliance.**

This dispute is between West Village and CWS and concerns forty-six (46) apartment units in which the current standard-size refrigerator does not leave sufficient clearance in the kitchen to satisfy FHA Accessibility Guidelines. West Village and CWS have identified two ways to make the kitchens accessible: (1) move the refrigerator to the pantry and convert the old refrigerator area to a pantry or, in some cases, move the kitchen island several inches to achieve the necessary clearance or (2) replace the existing refrigerator with a shallow model.

CWS wants option number (1). According to CWS, there are 46 units that require kitchen remediation. CWS maintains that twenty-seven (27) of the 46 can be made compliant by moving the refrigerator to the pantry and vice-versa. Presumably, the remaining nineteen (19) units will require moving the island.

According to West Village, there are forty-eight (48) units that require remediation. Forty-six can be made compliant by replacing the refrigerator with a 24" deep model. Only two (2) would require moving the kitchen counter islands.

West Village argues that CWS's proposal is unreasonably expensive, time-consuming, and burdensome. It will cause construction down-time and loss of rent to CWS. It calculates the cost of replacing refrigerators at approximately $1000.00 per unit and the cost of "moving kitchen islands or relocating the refrigerator to the pantry area and constructing a new pantry at the existing refrigerator location at approximately" $7,000 per unit, for a total of $322,000.00. (Docket No. 303-

1 Ex. A. at 3.)[2] [3] West Village notes the Consent Decree contains a provision that allows the Court to consider "unreasonable difficulty or expense" when resolving remediation disputes. West Village argues the expense and difficulty of implementing the solution offered by CWS is unreasonable.

CWS opposes the shallow-model refrigerator (option (2)) for several reasons. First, CWS believes the shallower and narrower replacement refrigerators are substandard and "second class." Second, the kitchen will remain non-compliant even with the shallow-model refrigerator.[4] [5]

### A. Smaller Refrigerators Are Substandard.

The Consent Decree between the Parties requires the residential units to be remediated to meet the standards of the Fair Housing Act which requires a 40" pathway clearance between opposing kitchen counters and a 48" parallel approach to stove cook tops.

CWS argues that installation of the smaller refrigerators would mean that tenants who want an accessible apartment would be forced to accept a second-rate refrigerator. CWS equates less storage capacity with less quality. (Docket #305 at 2.) CWS maintains this would violate the spirit

---

[2] West Village erroneously cites the cost of option (1) at $276,000.00. (Docket # 303 at 5.) West Village's own expert calculates the cost for option (1) at approximately $7,000.00 per unit, for a total of $322,000.00 for the 46 units. (Docket # 303-1, Ex. A at 3-4.)

[3] This case has been pending for seven years and yet this Court is still having to remind parties to read their Local Rules and comply therewith. Local Rule 7.1(i) requires appendices to be numbered sequentially.

[4] CWS's two other reasons for opposing the replacement option no longer exist. CWS initially argued that option (2) would place an unreasonable burden on CWS because it would offer new tenants the option of choosing the shallow refrigerator, thereby requiring CWS to maintain a sufficient stock of unused, small refrigerators. CWS also objected to the fact that the solution required the apartment complex to be deed restricted, which would have required any subsequent owner to continue this practice.
West Village has recently offered to maintain the stock of small refrigerators or replace all 46 refrigerators immediately, thereby eliminating the need for deed restrictions and other future burdensome administrative requirements. (Docket # 305 at 4 n. 3.)

[5] The Registered Accessibility Specialist ("RAS") assigned to this case has not submitted a report advocating either plan. The Parties have chosen for the Court to resolve the dispute without a specific recommendation by the RAS.

of the Fair Housing Act and also creates a "marketing and reputation problem for CWS which does not want to be known in the community as the landlord that only offers second class apartments to those with disabilities." (*Id.*)

CWS has not submitted any evidence to support its argument that the proposed replacement refrigerators should be considered second-rate. There is no testimony or documentation to suggest that the smaller refrigerators are a lesser quality than the existing refrigerators. Nor has CWS submitted any evidence to establish that inclusion of these refrigerators would adversely affect its reputation or its ability to lease or sell the units.[6] There is no testimony or evidence of any kind to prove that inclusion of the smaller refrigerators would cause others to perceive the apartments as less desirable.

### B. Smaller Refrigerators Are Still Too Big.

CWS argues that even if installed, the proposed refrigerators will not bring the kitchens into compliance. CWS argues that the proposed refrigerator is 27 1/4 inches deep (*See* Docket # 305 Ex. A), which allows a clearance of only 35 3/4 inches – considerably less than the 40-inches required for accessibility. In support of its argument, CWS points to a March 10, 2010 report by the RAS that states that in the A-5 and A-6 Units, the proposed refrigerator requires 28" in depth and can not be used. "Relocate refrigerator as shown." (Docket #305-2 Exs. B, C.)

West Village argues that installation of the smaller refrigerators will achieve a 39" or more pathway clearance and a 48" parallel approach to the stove cook tops. West Village maintains that

---

[6] Notably, Plaintiffs do not object to the installation of the smaller refrigerators, presumably because they do not consider the refrigerators to be "second-rate" or inadequate in any way.

the RAS and Plaintiffs will accept a 1' deviation from the 40" standard set forth in the FHA documents.

In support of its position, West Village submitted the affidavit of Robert Bagwell, who was retained by Plaintiffs during mediation to survey the apartments in need of kitchen remediation. (Docket # 303-1, Ex. A at 2.) Mr. Bagwell explains that in the 46 units at issue, appliances with a depth of 24" will be flush with the cabinet faces and will achieve compliance. (*Id.* at 3.) According to the evidence, Summit Appliance manufactures a 24" deep refrigerator (Model #FF1325SS). (Docket # 303 at 10, Docket # 309-1 at 7-8.)

The refrigerator that CWS says will not achieve compliance appears to be an entirely different Summit model with different dimensions. (Docket # 305-1 Ex. A.) CWS has not presented any evidence or reason to believe that the model proposed by West Village will not achieve compliance or will not be suitable in some other respect.

Therefore, the Court hereby requires West Village to replace the existing, non-compliant refrigerators with the 24"-deep refrigerators in the 46 apartment units at issue. For any unit that is currently vacant, the replacement must occur before a new lease is signed. For those units currently being leased, the current tenant must give its consent for the replacement to occur during the tenancy. If the tenant gives his consent, replacement shall occur as soon as possible. If a tenant does not consent to replacement during his tenancy, replacement must occur at the conclusion of the lease term or before a new tenant signs a lease.

If instead the Parties prefer to submit their own agreed-upon Plan for the Court's consideration, the Court is amenable to considering such a plan. The Court advises the Parties it will not agree to a process that goes on indefinitely. The Parties have fifteen (15) days to submit an

5

alternate plan, if they so choose. Otherwise, the Court's plan will go into effect after the fifteen (15) days have expired.

## II. Remediation of Loft Units.

CWS and Plaintiffs dispute whether the condominiums that are now owned by individuals who are neither parties to this lawsuit nor affiliated with either party must be remediated under the Consent Decree.

This lawsuit was filed in 2003. In 2004, during its pendency, West Village sold the residential portion of the property to CWS. CWS was not added as a party to the lawsuit. Instead, West Village agreed to indemnify CWS for any loss stemming from this case. West Village also agreed it would not settle this lawsuit without CWS's consent. West Village did not notify the Court or Plaintiffs' counsel about the CWS sale.

In 2004, after the sale, CWS converted 20 of the residential units from apartments to condominiums for individual sale ("Loft Unit"). None of the Loft Unit purchasers were notified about this lawsuit. In Fall 2004, West Village and Plaintiffs entered into a Consent Decree. West Village did not obtain CWS's approval. The Court granted the Consent Decree in August 2005. CWS did not learn of the Consent Decree until 2006. Between 2005 and 2008, CWS sold eighteen of the twenty lofts units to third-party purchasers.

CWS argues the Court should not require the individual Loft Unit owners to remediate because (1) they were innocent purchasers; (2) the statutes do not require them to remediate; and (3) requiring remediation now "will not significantly affect the availability of suitable condominium units to persons whose disabilities require use of a wheelchair." (Docket # 298 at 5.) CWS also

contends that because the loft owners are not bound by the Consent Decree, their units need not be FHA compliant.

Plaintiffs respond without citing any legal authority that CWS should not have been able to sell the Loft Units free and clear. They reason that because CWS is bound to the Consent Decree, the Loft Units that were owned and then sold by CWS must be remediated in accordance therewith. Plaintiffs also argue that CWS has no standing to represent the present loft owners.[7]

Plaintiffs' argument that the Loft Units must be remediated in accordance with the Consent Decree because CWS is bound by the Consent Decree is flawed in one key respect – CWS no longer owns the Loft Units. Though CWS would have been required to remediate the Loft Units when it owned them, it has since sold them to others.

A purchaser in good faith who pays valuable consideration for property without notice of another's adverse rights is commonly referred to as a bona fide purchaser. A bona find purchaser is generally protected from any adverse judgment against his purchase. *See* Tex. Prop. Code § 13.004(b) (Vernon 2010). Conversely, a purchaser who has notice of prior rights at the time of his purchase is not considered bona fide and consequently will not be shielded from adverse claims.

In 1983, Texas enacted a statute that prevents a property owner involved in litigation from selling his property to a bona fide purchaser in order to avoid the effect of adjudication on his property. *See World Savs. Bank, F.S.B. v. Gantt*, 246 S.W.3d 299 (Tex. App. - Houston [14th Dist.] 2008, no pet.). This "lis pendens statute" allows plaintiffs involved in litigation concerning property to file a formal notice describing the encumbrance on the property to prospective purchasers. Tex.

---

[7] As CWS points out, it is bound by the terms of the Consent Decree to remediate the residential units. Because CWS has a financial and legal interest in the remediation of the property, the Court finds it has standing to make this argument.

Prop. Code §§ 12.007-08. This recorded lis pendens acts as constructive notice to the world of its contents. *Id.* § 13.004(a).

It is undisputed that the Loft Unit owners were unaware of this litigation and the Consent Decree at the time of their purchases. It is also undisputed that the new Loft Unit owners were bona fide purchasers, in other words, they acquired legal title to their loft unit(s) in good faith, for valuable consideration, and without notice of any adverse interest. There is no suggestion the new purchasers had actual or constructive notice of Plaintiffs' claim or interest in the property. *See* 63 Tex. Jur. 3d Real Estate Sales § 263 (2010).

Plaintiffs did not file a lis pendens notice with the county clerk. Had they done so, potential purchasers would have had notice of this litigation and would have been bound by the remediation requirements that have been placed on the property. *See* G. Powell, *Real Estate Remedies: Lis Pendens*, 32 The Advocate (Texas) 70, 70-71 (Fall 2005). Because no such notice was filed, the Loft Unit owners are not bound by the remediation requirements of the Consent Decree.

### III.   **Violation of Consent Decree.**

CWS purchased the residential areas of the property in early-June 2004. During pre-sale negotiations, CWS learned about this lawsuit. The Earnest Money Contract signed by CWS and West Village contained a provision prohibiting West Village from entering into any agreement or settlement of this particular case without CWS's consent. (Docket # 245 at 3.)

West Village signed the Consent Decree in early-September 2004 without CWS's consent. West Village and Plaintiffs moved the Court for approval of the Consent Decree on September 17, 2004. The Court conditionally approved the Consent Decree on October 19, 2004. The Court finally approved the Consent Decree on August 17, 2005. (Docket #245 at 4.)

CWS learned of the Consent Decree on November 21, 2005. (Docket #245 at 4.) CWS contends that because the remediation plan did not identify any particular apartment unit in need of remediation, the apartments did not require remediation. (Docket # 298-2 at 3.-4). CWS states "*[O]n its face, there is nothing in the Consent Decree that requires any remediation beyond what is listed in Exhibit A, and therefore no requirement to remediate any loft unit.*" (*Id.* at 4 (emphasis in original).

The Consent Decree required remediation of CWS's residential property in accordance with a detailed remediation plan and in compliance with federal accessability guidelines. The Introduction to the Consent Decree explicitly includes the "apartments" as part of the property covered by the agreement. Section 2.2 of the Consent Decree gives a detailed description of how to deal with tenants during remediation of the apartment units. Section 2.10 provides detailed procedures for remediating the apartment units in particular. Beginning "in early-2006, Plaintiffs' counsel and the RAS began" surveying the residential areas for non-compliance. (Docket # 298-2 at 4.) Certainly, this put CWS was on notice that the Consent Decree applied to the residential units. CWS's suggestion that it believed the apartment units were exempt from the terms of the Consent Decree is intellectually dishonest.

After learning of the Consent Decree, rather than complying therewith (or getting assurances that the apartments were exempt therefrom), CWS continued to sell off residential units in flagrant disregard of the terms of the Consent Decree and the law. In fact, 11 of the 18 units that have been sold were sold after CWS received actual notice of the Consent Decree. Ten of the 18 were sold after the RAS began surveying the residential properties for non-compliance.

The Court hereby invites the Parties to submit briefing on why CWS should or should not be held in contempt for violating the terms of the Consent Decree by selling the property that was the subject thereof. The Parties are also invited to submit briefing on whether West Village should be sanctioned for failing to disclose to Plaintiffs and the Court that the property that was the subject of the Consent Decree had been sold to CWS.

It is SO ORDERED, this 8th day of June 2010.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE